*Decision will be entered under Rule 50.*

HUGH SMITH, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 8389. Promulgated March 28, 1947.

*F. E. Hagler, Esq.*, for the petitioner.

*F. M. Thompson, Jr., Esq.*, and *S. Earl Heilman, Esq.*, for the respondent.

OPINION.

TYSON, *Judge*: The respondent increased petitioner's reported "royalty" income for the years 1934 to 1940, inclusive, and reduced its reported "royalty" income for 1941, so that the "royalty" income each

year equaled 20 cents per gallon on all Coca-Cola syrup used in such year in his personally owned Coca-Cola bottling works by Hugh Smith, who originally owned 45 shares, and later 35 shares, of the outstanding 60 shares of petitioner. These adjustments were made under authority of section 45 of the Revenue Acts of 1934, 1936, and 1938 and the Internal Revenue Code,[1] "in order to clearly reflect your income." Respondent also increased petitioner's reported net income for various of the taxable years by disallowing claimed deductions for salaries to Hugh Smith or his wife, excessive depreciation on automobiles, certain operating expenses, taxes, and auto repairs. Petitioner concedes the correctness of all such adjustments to its income, except the increase in "royalty" income.

On the first issue, there can be no doubt that petitioner was controlled, within the meaning of section 45, *supra*, by Smith until his death and thereafter by his estate, as were also, of course, Smith's individually owned plants, and no contention to the contrary is made by petitioner. On this issue, however, petitioner contends that section 45 is not applicable, for the principal reason that it "did not operate under the contract" with Thomas, Inc., or its contract with Hugh Smith, the individual, and, therefore, "did not earn the income attributed to it." Petitioner's contention that it "did not operate under its contract with Thomas" seems to be predicated upon the facts (1) that Smith, as an individual, ordered the syrup used by his plants directly from the parent Coca-Cola company and received delivery thereof from that company rather than from petitioner; (2) that Smith, individually, paid Thomas, Inc., $1.30 per gallon for the syrup so used and did not pay petitioner therefor; and (3) that, as asserted by petitioner, it did not actually buy and sell syrup. From these facts petitioner would have us conclude that the income here involved was not derived under the contract between itself and Smith and that, consequently, it was not entitled to and did not receive as income the 20 cents per gallon on the syrup used by Smith's individual companies as provided by that contract.

We do not think the facts recited, or any other shown by the record, sustain the contention of the petitioner, that it did not operate under its contract with Smith. In order to save time and expense in performing its contract each subbottler, such as was Smith, had authority to order syrup direct from the parent Coca-Cola company and to

[1] SEC. 45. ALLOCATION OF INCOME AND DEDUCTIONS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income or deductions between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations, trades, or businesses.

receive delivery from that company. The time and expense saved in the ordering of the syrup by Smith direct from the parent Coca-Cola company rather than from petitioner and the direct shipments of syrup on such orders by the Coca-Cola company to Smith's individually owned companies was obviously the time which would have been consumed and the expense which would have been incurred by sending the orders for syrup from the subbottler (Smith's plants) to the first line bottler (petitioner), then to Thomas, Inc., then to the parent Coca-Cola company, and then, in making shipments, in the reverse order down the line. Under these circumstances we think that this agreed deviation from the strict terms of the contract between petitioner and Smith is immaterial and does not support the contention of petitioner that the transactions were not had under the contract between petitioner and Smith.

As to the payments of $1.30 per gallon for the syrup being made direct by Smith to Thomas, Inc., it was dependent upon the method of payment arranged between the subbottler (Smith) and the first line bottler (petitioner) and it was immaterial to Thomas, Inc., from whom it received payment. The performance and enforcement of the contract between petitioner and Smith were in the hands of the latter, since he controlled petitioner and his own bottling plants. It was Smith who determined both for himself individually and for petitioner the method by which his contract with petitioner was to be performed, and his payment of $1.30 per gallon for such syrup to Thomas, Inc. (thus relieving petitioner from making such payment), instead of paying direct to petitioner, was also an immaterial deviation from the express terms of the contract providing for payment direct to petitioner; the more especially so since the deviation was obviously because of an arrangement between petitioner, controlled by Smith, and Smith individually in the performance of their contract. We think that this deviation does not in any wise support the contention of petitioner, that the transactions were not had under the contract between petitioner and Smith.

Furthermore, as to the contention that petitioner did not operate under its contract with Smith and consequently did not earn the income attributed to it (20 cents for all gallonage used by Smith), it seems that the income it did actually report in its returns must be regarded as having been received on the basis of 20 cents per gallon on some of the gallonage used by Smith, and consequently received through operation under its contract with him, because: The sole purpose of petitioner's existence was to acquire the rights, as it did, from Thomas, Inc., which rights it could not itself exercise after contemporaneous transfer of same to Smith; no party could bottle to sell Coca-Cola in the territory controlled by Thomas, Inc., without a carefully

drawn written contract permitting it to do so under the terms and conditions prescribed by such contract and there is no other written contract shown in the record except the contract in question; a comparison of petitioner's income reported in its returns as royalties with the amounts of syrup used by Smith's individual companies in 1941 and for the period from January 1 to May 30, 1942, shows (a) that Smith's companies used 104,985 gallons of syrup in 1941 while for that year petitioner reported $21,030 as income from "royalties," that income slightly exceeding 20 cents per gallon on gallonage of syrup used by Smith's companies during that year and by which excess respondent reduced petitioner's income for that year, and (b) that Smith's companies used 30,593 gallons of syrup for the period January 1 to May 30, 1942, while petitioner reported for the same period $6,118.60 as "royalty" income, which income was identically 20 cents per gallon on gallonage of syrup used by Smith's companies during the same period—and it is significant that the returns for the two mentioned periods were made after Smith's death (when his power to allocate income between petitioner and his companies ceased) by the executor of his estate, who thus obviously regarded the total profits of petitioner for those periods to have been received by petitioner under its contract with Smith, and at the rate of 20 cents per gallon on all gallonage used by Smith as a result of carrying out that contract.

Moreover, it may be further observed with regard to this contention that there is nothing in the record indicating that the amounts reported by petitioner in its returns were received from any source other than from petitioner's operation under its contract with Smith.

We think that petitioner bought and sold the syrup here involved under its contract with Smith; and if it did not, it nevertheless carried out its obligation under the contract to "obtain and furnish" the syrup to Smith.

In view of our conclusion that the operations of petitioner were performed under its contract with Smith, we have left on the first issue merely the question of whether the income involved, of 20 cents per gallon on all syrup used by Smith's individually owned companies, was properly allocated to petitioner under that contract.

Under petitioner's contract with Thomas, Inc., petitioner acquired the exclusive right and license to purchase syrup and "to use and vend on bottled Coca-Cola the trade-mark name Coca-Cola, and all labels and designs pertaining thereto" in a designated territory for an amount measured by $1.30 per gallon of syrup. Under petitioner's contract with Smith the latter acquired the same rights as petitioner had acquired from Thomas, Inc., and as a consideration therefor Smith agreed to pay petitioner an amount measured by $1.50 per gallon of syrup used by Smith. Thus petitioner was to receive in-

come, or profit, measured by 20 cents per gallon on all syrup used by Smith; and this without the rendition of any services by petitioner except to see that delivery of the syrup was made to Smith upon his purchases. Under the contract between Smith and petitioner, Smith used the gallonage in the various years as set out in our findings and included in his returns for each year the income realized by him through his individually owned companies from such use. The respondent in determining the deficiencies herein for each taxable year allocated as gross income to petitioner from Smith's reported income for such year an amount equal to 20 cents per gallon on all Coca-Cola used by Smith in such year; and it is the correctness of such allocation which is here involved.

We are of the opinion, and so hold, that these allocations are correct to the extent of 20 cents per gallon on the total gallonage shown in our findings to have been used by Smith each year; but it is to be understood that such allocations constitute the entire gross income of petitioner and are not to be added to that reported in its returns. When this income from use of this gallonage was reported in Smith's returns it was not Smith's income, but that of petitioner, to which it was entitled under the plain terms of its contract with Smith. It was Smith, having the income in hand, who made this allocation between himself as an individual and the petitioner, his controlled corporation. He merely allocated the income of petitioner to himself rather than to petitioner as he should have done.

Under these circumstances the fact that petitioner did not actually receive from Smith all the amounts to which it was entitled does not prevent the applicability of section 45. That section expressly permits the apportionment, allocation, or distribution of income between two or more businesses owned or controlled directly or indirectly by the same interests. To allocate or distribute income between or among two or more businesses presupposes the receipt of such income by one of the group, or by some of the group in incorrect proportions for tax purposes. To hold that income may not be allocated to a member of a group within the statute because it had not actually received such income, would nullify the purpose for which section 45 was intended, i. e., to prevent the evasion of taxes or clearly to reflect the income of any such organizations, trades, or businesses as were owned or controlled by the same interests.

The authorities cited by petitioner as to the nonapplicability of section 45, including *Tennessee-Arkansas Gravel Co.* v. *Commissioner*, 112 Fed. (2d) 508; *Seminole Flavor Co.*, 4 T. C. 1215; *Essex Broadcasters, Inc.*, 2 T. C. 523; *Koppers Co.*, 2 T. C. 152; and *Briggs-Killian Co.*, 40 B. T. A. 895, are so inapposite on their facts as to require no distinction.

The second issue presents the question of whether or not the petitioner is a personal holding company under section 351 of the Revenue Act of 1934 and corresponding sections of the Revenue Acts of 1936, 1937, 1938, and the Internal Revenue Code.

The definition of a personal holding company is found in section 351 (b) (1) of the Revenue Act of 1934.[2] It laid down two tests, viz., stock ownership and certain classes of gross income. The stock ownership requirement remained the same in later acts as in the 1934 Act. The gross income requirement was changed somewhat in the 1937 Revenue Act, section 352 (a) (1).[3] The 1937 Act also added new classes of gross income, including compensation received for the use of corporation property by a shareholder, section 353 (f).[4]

Hugh Smith, from March 1937 until the date of his death August 25, 1940, owned 35 shares of the outstanding 60 shares of petitioner, or 58.33 per centum of petitioner's outstanding shares. Thereafter, his

---

[2] SEC. 351. SURTAX ON PERSONAL HOLDING COMPANIES.

\* \* \* \* \* \* \*

(b) DEFINITIONS.—As used in this title—

(1) the term "personal holding company" means any corporation (other than a corporation exempt from taxation under section 101, and other than a bank or trust company incorporated under the laws of the United States or of any State or Territory, a substantial part of whose business is the receipt of deposits, and other than a life-insurance company or surety company) if—(A) at least 80 per centum of its gross income for the taxable year is derived from royalties, dividends, interest, annuities, and (except in the case of regular dealers in stock or securities) gains from the sale of stock or securities, and (B) at any time during the last half of the taxable year more than 50 per centum in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals. For the purpose of determining the ownership of stock in a personal holding company— (C) stock owned, directly or indirectly, by a corporation, partnership, estate, or trust shall be considered as being owned proportionately by its shareholders, partners, or beneficiaries; (D) an individual shall be considered as owning, to the exclusion of any other individual, the stock owned, directly or indirectly, by his family, and this rule shall be applied in such manner as to produce the smallest possible number of individuals owning, directly or indirectly, more than 50 per centum in value of the outstanding stock; and (E) the family of an individual shall include only his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants.

[3] SEC. 352. DEFINITION OF PERSONAL HOLDING COMPANY.

(a) GENERAL RULE.—For the purposes of this title and of Title I the term "personal holding company" means any corporation if—

(1) GROSS INCOME REQUIREMENT.—At least 80 per centum of its gross income for the taxable year is personal holding company income as defined in section 353; but if the corporation is a personal holding company with respect to any taxable year, then, for each subsequent taxable year, the minimum percentage shall be 70 per centum in lieu of 80 per centum, until a taxable year during the whole of the last half of which the stock ownership required by paragraph (2) does not exist, or until the expiration of three consecutive taxable years in each of which less than 70 per centum of the gross income is personal holding company income; \* \* \*

[4] SEC. 353. PERSONAL HOLDING COMPANY INCOME.

For the purposes of this title the term "personal holding company income" means the portion of the gross income which consists of:

\* \* \* \* \* \*

(f) USE OF CORPORATION PROPERTY BY SHAREHOLDER.—Amounts received as compensation (however designated and from whomsoever received) for the use of, or right to use, property of the corporation in any case where, at any time during the taxable year, 25 per centum or more in value of the outstanding stock of the corporation is owned, directly or indirectly, by or for an individual entitled to the use of the property; whether such right is obtained directly from the corporation or by means of a sub-lease or other arrangement.

estate continued to own the same number of shares. The remaining 25 shares were held by four persons including Smith's wife, who held 10 shares. Thus the statutory stock ownership requirement of 50 per centum in value of the corporation's outstanding stock by or for not more than five individuals during all the taxable years is met.

It is argued by petitioner that the income as determined by respondent is not income in the nature of royalties, as contended by respondent, but, rather, represents profits from the purchase of merchandise (Coca-Cola syrup) at $1.30 a gallon and its resale at $1.50 a gallon. This argument is inconsistent with a contention it makes that petitioner never operated and never purchased a gallon of syrup at any time during its existence.

The term "royalties" is not defined in the statutes. Regulations 86 and 94, article 351-2, under the Revenue Acts of 1934 and 1936, defines the term as follows:

The term "royalties" includes amounts received for the use of or for the privilege of using patents, copyrights, secret processes and formulas, good will, trade marks, trade brands, franchises, and other like property. * * *

In Ways and Means Committee Report No. 1546, 75th Cong., 1st sess., pertaining to the Revenue Bill of 1937, p. 4, it is stated:

"Royalties" as used herein has the same meaning as in the case of royalties referred to in section 351 of the existing law, and, therefore, includes income from copyrights.

This indicates approval by Congress of the definition of royalties contained in the regulations, as does also the reenactment by Congress of later practically identical acts as to royalties.

Thomas, Inc., transferred to petitioner "the sole and exclusive rights and license * * * to use and vend on bottled Coca-Cola the trade mark name Coca-Cola, and all labels and designs pertaining thereto, in connection with the product 'Bottled Coca-Cola' " in specified territory. This was a very valuable right. Thomas, Inc., had a similar contract from the Coca-Cola Co. covering, however, a larger territory.

In *Puritan Mills*, 43 B. T. A. 191, we held that payments to a taxpayer corporation by another corporation for the use of the taxpayer's name on bags containing flour and feeds blended, put up, and sold for its own account by the other corporation constituted payments of "royalties" under section 351 (b) (1) of the Revenue Acts of 1934 and 1936 and that consequently the taxpayer was a "personal holding company" as far as the requirement of those sections as to income being from royalties was concerned. We see no difference between the character of the payments which we have, in effect, held under the first issue to have been made to petitioner and the payments made in *Puritan Mills*, except that there the payments were solely for the use of a trade-mark, while here the payments were made for the right to

use "the trade mark name Coca-Cola, and all labels and designs pertaining thereto," as well as for the purchase price of syrup used by Smith in making the final product of Coca-Cola. In view of the fact that, undoubtedly, a portion, and probably the larger portion, of the payments was attributable to the right to the use of "the trade mark name Coca-Cola, and all labels and designs pertaining thereto," which was a very valuable right, and in view of the further fact that the record is devoid of any showing as to the portion of the payments attributable, respectively, to the purchase price of the syrup and the right to use the trade-mark name Coca-Cola, etc., we are unable to determine what portion of the payments is attributable to the one or the other. *Lane-Wells Co.*, 43 B. T. A. 463; affirmed on this point, 134 Fed. (2d) 977. In these circumstances, we are of the opinion that the income which we have held under the first issue to have been properly allocated to petitioner must also be held, for Federal income tax purposes, to be income of the petitioner from "royalties" within the purview of section 351 (b) (1), *supra; Puritan Mills, supra; Lane-Wells Co.*, 134 Fed. (2d) 977; and *Commissioner* v. *Affiliated Enterprises, Inc.*, 123 Fed. (2d) 665; certiorari denied, 315 U. S. 812.

It is also argued by petitioner that the income which we have held on the first issue to have been received by it was not royalties, because they were not "proportionately to the use made of the right by the grantee" (*Lane-Wells Co., supra*), and it points to the gallons of syrup used by Smith in the years 1934 to 1940, inclusive, and the amounts paid to petitioner by Smith, as shown on petitioner's income tax returns. Such argument becomes of no moment in view of our conclusion on the first issue.

The cases, among which are *Kiesau Petroleum Corporation*, 42 B. T. A. 69; and *U. S. Universal Joints Co.*, 46 B. T. A. 111, cited by petitioner in support of its contention that the income involved was not from "royalties," are so clearly distinguishable on their facts as to require no further comment.

In computing the statutory personal holding company income of petitioner subject to surtax, the respondent did not allow any credits or deductions from "adjusted net income" for dividends paid during any of the taxable years.

Section 351 (a) of the Revenue Act of 1934, as did all succeeding statutes applicable here, imposes a surtax on a personal holding company's "undistributed adjusted net income." Section 351 (b) (2) (C) of that act defined the term "undistributed net income" as "the adjusted net income minus * * * dividends paid during the taxable year," which definition obtained throughout the years 1934 and 1935. Section 351 (b) (2) (C) of the Revenue Act of 1936 defined "undistributed adjusted net income" as "the adjusted net income minus

\* \* \* the amount of the dividends *paid credit* provided in section 27 \* \* \*." Section 27 (a) provides that the "dividends paid credit shall be the amount of the dividends paid during the taxable year," but subdivision (g) of that section provides that "no dividends paid credit shall be allowed with respect to any distribution unless the distribution is pro rata, equal in amount and with no preference to any share of stock as compared with other shares of the same class."

Provisions similar in effect to those set out above as provisions of sections 351 and 27 of the 1936 Act obtained in all subsequent years here involved. Sec. 1, Revenue Act of 1937, amending sec. 351, Revenue Act of 1936; secs. 405 and 27, Revenue Act of 1938; and secs. 504 and 27, Internal Revenue Code.

Should the respondent, in computing the personal holding company income of petitioner, have allowed any credits or deductions as provided by the cited statutes?

On the first issue, we have decided that there should be included in petitioner's income in each year an amount of 20 cents per gallon on the total number of gallons used by Smith in his individual business during such year. Inasmuch as we have thus decided and inasmuch as those amounts were retained, with petitioner's obvious approval, by Smith who was a stockholder of petitioner, we are of the opinion, and so hold, that such amounts constituted a preferential "dividend" distribution to Smith as a stockholder of petitioner. *Paramount-Richards Theatres, Inc.* v. *Commissioner*, 153 Fed. (2d) 602, and *Forcum-James Co.*, 7 T. C. 1195. In computing petitioner's personal holding company surtax for 1934 and 1935, respondent has not allowed petitioner any credit for "dividends paid during the taxable year," and in that respect he erred.

On January 1, 1934, petitioner had a deficit of $4,875.22. On the basis of our conclusion on the first issue, the gross income of petitioner for 1934 was $10,713 (20 cents per gallon on the 53,565 gallonage used by Smith during that period) and for 1935 was $10,784.20 (20 cents per gallon on the 53,921 gallonage used by Smith during that period). The parties have agreed that certain deductions disallowed by respondent for each of the years 1934 and 1935 were proper. This leaves as the sole allowable deductions from the gross income of petitioner for 1934 the total amount of $618.08, and for the year 1935 the amount of $766.58.

When from its gross income of $10,713 for 1934 there is deducted the $618.08, the net income of petitioner for that year was $10,094.92. Applying $4,875.22 of that amount to restore the amount of the deficit existing at the beginning of 1934 leaves $5,219.70 of the profits and earnings of that year distributable as dividends. Therefore, of the amount of $10,713 retained by Smith in that year $5,219.70 constituted

a preferential dividend, which, under the applicable statutes in force for that year, should be allowed as a dividend paid credit in computation of petitioner's "undistributed net income" subject to personal holding company surtax. When from its gross income of $10,784.20 for 1935 there is deducted the $766.58 above mentioned, the net income of petitioner for that year was $10,017.62, distributable as dividends. Therefore, of the $10,784.20 retained by Smith in that year $10,017.62 constituted a preferential dividend which under the applicable statutes in force for that year should be also allowed as a dividends paid credit in computation of petitioner's "undistributed net income" subject to personal holding company surtax. It follows that petitioner in neither of the years 1934 or 1935 was subject to tax as a personal holding company.

The contrary is true as to all the taxable years subsequent to 1935, for the amounts retained by Smith during those years were "preferential dividends" and not pro rata distributions, "equal in amount and with no preference to any share of stock as compared with other shares of the same class" as required by the cited statutes in force in all the taxable years subsequent to 1935.

It is conceded by petitioner that it did not file personal holding company returns for any of the periods involved.

For the years 1934 and 1935, under section 291 of the Revenue Acts of 1934 and section 406 of the Revenue Act of 1935, the imposition of the penalty would be mandatory if the petitioner had undistributed net income subject to personal holding company surtax during those years. However, by reason, as shown above, of the application of some of its allocated income in 1934 to eliminate a deficit and by further reason of the fact that its remaining allocated income was, as we have held herein, distributed during 1934 and 1935 to Smith as preferential dividends, the petitioner had no undistributed personal holding company net income subject to surtax for either 1934 or 1935. Therefore, since petitioner had no such surtax liability, it is not subject to any penalty for failing to file personal holding company returns for those years. *Oscar K. Eysenbach,* 10 B. T. A. 716; *H. D. Ruos,* 13 B. T. A. 240; and *Oklahoma Contracting Corporation,* 35 B. T. A. 232.

Under section 291 of the Revenue Acts of 1936 and 1938 and of the Internal Revenue Code, the penalty for failure to file a return for 1936 and subsequent years may be avoided by a showing that such failure was due to reasonable cause and not due to willful neglect. *Commissioner* v. *Lane-Wells Co.,* 321 U. S. 219. The various penalties imposed to insure payment of income tax are designed to meet the various causes of default, but, since the law is complicated and gives rise to problems of great complexity and innocent errors are numerous, "It is not the purpose of the law to penalize frank difference of opinion

or innocent errors made despite the exercise of reasonable care. Such errors are corrected by the assessment of the deficiency of tax and its collection with interest for the delay." *Spies* v. *United States*, 317 U. S. 492. See also *Commissioner* v. *Clarion Oil Co.*, 148 Fed. (2d) 671.

In our opinion, the facts herein clearly show that the failure on the part of petitioner to file such returns for the years subsequent to 1935 was due to reasonable cause and not to willful neglect.

An internal revenue agent made a report on petitioner's income tax return for 1934 based upon his examination of that return and of the books and records of petitioner. In that report a deficiency was found by sole reason of the disallowance of claimed excessive depreciation and a net income of $923.79 was determined. It was stated in the report with regard to petitioner's income that "Its only income is the royalties from his (Smith's) individual plant locations." There was no suggestion in the report that petitioner was subject to tax on personal holding company income notwithstanding the fact that the revenue agent examined all the records of petitioner, which then, no doubt, disclosed, as we have found to be a fact, that petitioner had declared no dividend and made no distribution purporting to be such to its stockholders. The revenue agent was thus apprised of the fact that all of petitioner's $927.79 net income or profits for 1934 remained undistributed, and yet he suggested no imposition of personal holding company surtax on that amount.

With all the facts before the revenue agent and the petitioner alike at the time the agent made his report on petitioner's income for 1934 and the agent, presumably an expert, obviously holding the view that no cause whatsoever existed for holding petitioner liable for personal holding company tax for that year, it would seem that petitioner would be justified in holding the same view, and, that consequently, it had reasonable cause for not filing personal holding company returns for that year; and, by the same token, there having been no further examination of petitioner's records until the examination resulting in the deficiency herein, and the petitioner having in all subsequent years continued to conduct its business in the same manner and to receive the same character of income as it did in 1934, it would also seem that petitioner had reasonable cause for failing to file personal holding company returns for those subsequent years. As further indicating that petitioner had reasonable cause for failing to file personal holding company returns, it is shown that, except for the year 1934, each of petitioner's income tax returns as filed for the years 1931 to 1940, inclusive, reported a net loss and, except for the one year 1934, neither the income nor the claimed deductions resulting in the net losses as reported on such returns were questioned by respondent at any time prior to his

determination involved herein.  It would thus also seem that if, year by year up to the time of the determination from which this proceeding was instituted, the respondent, having knowledge of the factual circumstances surrounding petitioner's business through his agent's report for 1934, did not deem it necessary for petitioner to file personal holding company returns, then certainly those same factual circumstances of which petitioner also, of course, had knowledge, afford reasonable cause for petitioner's failure to file such returns for those years.

The respondent erred in determining the penalties involved.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

ARNOLD, *J.*, concurs only in the result.

---

DISNEY, *J.*, dissenting: I must dissent to the holding of the majority that the petitioner was not subject to penalty for failure to file personal holding company returns.  The reasons given by the opinion are, in effect, that as to each year, except 1934, the petitioner's income tax returns reported a net loss, and that an internal revenue agent examined petitioner's income tax return for 1934 and found a net income of $927.79 and a deficiency of $121.17, due to disallowance of excessive depreciation, the agent stating in the report that the petitioner's only income was the royalties from Smith's individual plant locations.  To hold that this constitutes reasonable cause in failing to file the return, in my view, is altogether inconsistent with the previous cases on the subject.  Mere belief that a corporation is not subject to the tax is not reasonable cause for failure to file.  *P. Dougherty Co.*, 5 T. C. 791 (800), and cases cited.  Moreover, in *Searles Real Estate Trust*, 25 B. T. A. 1115 (not a personal holding company case), the excuse proffered for failure to file return was that an offer was made to file a belated return, but a revenue agent had told those in charge of petitioner's affairs that it need not file; yet, we held that such facts did not suffice to excuse failure to file a return.  It is true that that case arose under section 1311 of the Revenue Act of 1921 (in this respect the same as section 291 of the Revenue Act of 1934) under which a return, though belated, must be filed, whereas since the Act of 1936 the statutes have provided for showing of reasonable cause as excuse for not filing.  Nevertheless, it seems to me that the case is recognition of the fact that conduct of a subordinate departmental officer may not be relied on as reasonable cause.  Though the statute here involved did not, like the former one, absolutely require a belated filing, yet it did make a requirement—a showing of reasonable cause, and the language of the *Searles* case is still applicable: "We find no provision in the law

which would permit the Commissioner to waive this requirement of the statute by the conduct of his subordinate employees \* \* \*." I think that reasonable cause may not be predicated in the attitude of a revenue agent, at least not where, as here, he merely failed to do anything or say anything as to the personal holding company situation. Even if positive statements by an agent could constitute reasonable cause, surely silence does not. In general, silence may estop only where there is a positive duty to speak. The excuse here offered amounts to a contention that a revenue agent has a duty of informing the taxpayer of all of his rights and duties—a view I consider neither sound, logical, nor administratively feasible. In line with the conclusion in the *Searles* case, and citing it, is our statement in *Blum Folding Paper Box Co.*, 4 T. C. 795 (799), that, "The Government can not be estopped by statements of its agents which are beyond the scope of their authority." Moreover, the majority opinion holds that for 1934, as to which the revenue agent made the examination, there was, due to a deficit and distribution of preferential dividends to Smith, no undistributed personal holding company net income subject to surtax, and therefore no penalty for failure to file return. Such situation may have been the reason that the revenue agent made no suggestion that the petitioner was liable as a personal holding company for 1934. In my opinion, at least in the absence of explanation in this regard, the agent's silence as to personal holding company status offers no reasonable cause for failure to file; and the situation as to whether there was personal holding company income might change from year to year, so that even if the agent had made a positive statement in that regard for 1934, it would be no reasonable excuse in later years. I therefore respectfully dissent to the conclusion on the penalty issue.