Estate of Hugh Smith, Deceased, the First National Bank of Memphis, Executor v. Commissioner.
Estate of Hugh Smith v. Commissioner
Docket No. 8425.
United States Tax Court
1947 Tax Ct. Memo LEXIS 259; 6 T.C.M. (CCH) 358; T.C.M. (RIA) 47083; March 31, 1947
*259 Held, that respondent erred in increasing the decedent's closing inventory when he made no corresponding adjustment of his opening inventory for 1939. Held, that respondent erred in increasing the decedent's taxable income by certain amounts, for the periods involved, as long-term capital gains derived from distributions out of capital of Hugh Smith, Inc. F. E. Hagler, Esq., 2804 Sterick Bldg., Memphis 3, Tenn., for the petitioner. Frank M. Thompson, Jr., Esq., and S. Earl Heilman, Esq., for the respondent. TYSON Memorandum Findings of Fact and Opinion TYSON, Judge: The respondent determined deficiencies in income tax of $13,411.09 and $9,275.45 for the year 1939 and the period January 1 to August 25, 1940, respectively. The questions presented are whether the respondent erred: (1) in increasing closing inventory for 1939 by $21,750.90 and (2) in determining a longterm capital gain of $13,839.82 and $10,739.47 in 1939 and in the period from January 1 to August 25, 1940, respectively. There is an alternative question that if the respondent did not err in increasing closing inventory for 1939 by $21,750.90 did he nevertheless not err in failing to determine an opening inventory for January 1, 1939. Other issues raised by the petitioner have been conceded or abandoned. The parties have agreed that facts pertinent to the second issue herein as shown by the record of the proceedings at the hearing of Hugh Smith, Inc., Docket No. 8389, shall be considered as incorporated in this record for the purpose of consideration *261 of that issue. Such facts will be so considered. Findings of Fact The petitioner is the executor of the estate of Hugh Smith, who died August 25, 1940. The decedent until his death was a resident of Union City, Tennessee and filed his income tax return for 1939 with the collector of internal revenue for the district of Tennessee. The petitioner, as executor of Smith's estate, also filed an income tax return for the period January 1 to August 25, 1940 with the same collector. Prior to September 3, 1931, and until his death on August 25, 1940, Smith operated Coca-Cola bottling plants at Union City, Dyersburg, and Martin, Tennessee and at Fulton and Hickman, Kentucky. The inventories at cost at the beginning and end of 1939, as reported on the income tax return filed by decedent and the inventories at cost at January 1, 1940 and August 25, 1940, as reported on the income tax return filed by Hugh Smith's executor and the inventories for those dates as determined by respondent are as follows: 1939
1940
Jan. 1
Dec. 31
Jan. 1
Aug. 25
Reported in return
$16,993.77
$13,316.46
$13,316.46
$23,173.57
Determined by Commissioner
35,067.36
35,067.36
45,921.37
*262 On January 1, 1939, decedent had on hand bottles and cases costing $16,301.96 which had been acquired and accumulated throughout several prior years, and this amount was not included by respondent as an opening inventory for January 1, 1939. During 1939 decedent paid $5,448.94 for bottles and cases. The inventories shown on the 1939 and 1940 returns included the finished product Coca-Cola, Coca-Cola syrup, sugar, extracts, and carbonic gas on hand, but did not include bottles or cases on hand at the beginning or end of each period or those purchased during each period. It had been decedent's consistent method of accounting since at least 1935 to inventory the finished product Coca-Cola, Coca-Cola syrup, sugar, carbonic gas and extract on hand and to charge bottles, cases and coolers as purchased to operating expenses, and this method obtained during the taxable periods. The method of inventorying in the Coca-Cola businesses was not uniform. Some Coca-Cola businesses inventoried bottles and cases while others charged such items to expense as purchased, as did decedent's plants. The respondent has accepted either method if consistently used. In decedent's income tax return *263 for 1939 he included in "Schedule D. - PROFIT (OR LOSS) FROM BUSINESS OR PROFESSION" the amount of $357,107.54 as "Total receipts" from the "Mft. Soft Drinks" and in the income tax return for the period January 1 to August 25, 1940 Smith's executor included $233,257.05 in Schedule D of the income tax return for that period as "Total receipts" from "Coca-Cola Bottling." In the returns in Schedule D thereof the cost of bottles and cases was charged to expense in the year they were purchased. These returns reflected income from the use of bottles and cases as follows: When the finished product Coca-Cola, contained in the bottles and cases, was sold by decedent to a customer, that customer made a deposit to protect decedent against failure to return the bottles and cases; if and when the bottles and cases were returned the customer was refunded his deposit thereon and the amount of the excess of deposits over refunds was included in income under Schedule D of the returns as part of the total receipts of the business. The decedent's method of accounting correctly reflected income for the years in question. During the years material here, the Coca-Cola Bottling Works (Thomas) Inc. (hereinafter *264 referred to as Thomas, Inc.) and known as a "parent bottler under the Coca-Cola Company," had a contract with the Coca-Cola Company granting it exclusive rights and privileges as to the bottling and selling of Coca-Cola in certain states which rights and privileges it was permitted to assign to others. Under this right to assign, Thomas, Inc. entered into a "Bottlers Contract (First Line)" with Hugh Smith, Inc., transferring to the latter exclusive bottling and selling privileges as to Coca-Cola in a certain territory in consideration of the latter's agreement to buy of, or through, Thomas, Inc. at $1.30 per gallon all the Coca-Cola syrup delivered at any point in that territory as required or used in the preparation of the bottled goods in any bottling plant established by Hugh Smith, Inc. in such territory. Hugh Smith, Inc. also was permitted to assign its rights under its contract and under such permission Hugh Smith, Inc. entered into a "Sub-bottler's Contract" with the decedent transferring to the latter the exclusive bottling and vending rights and privileges within a prescribed territory in consideration of the decedent's agreement to buy of, or through, Hugh Smith, Inc. at *265 $1.50 per gallon, all the Coca-Cola syrup required or used in the decedent's several bottling plants. Under those contracts, and to save time and expense, the decedent was authorized to, and did, place orders for its syrup direct with the Coca-Cola Company, (such orders being considered by the parties as having been given through Thomas, Inc.), and the Coca-Cola Company shipped the syrup direct to decedent's five personally owned bottling plants. The decedent made payment direct to Thomas, Inc. of $1.30 per gallon for all syrup used in his bottling plants. Decedent never ordered syrup directly from Hugh Smith, Inc. and the latter never directly placed an order with Thomas, Inc. or Coca-Cola Company and never directly paid either of them for any syrup shipped to the decedent's bottling plants. The contract which Hugh Smith, Inc. had with Thomas, Inc. was similar to one which decedent, individually, had theretofore had with Thomas, Inc., and Hugh Smith, Inc. was organized by decedent in 1931 for the purpose of acquiring from Thomas, Inc. a contract similar to that theretofore held by decedent. The decedent at all material times controlled Hugh Smith, Inc. and during the taxable periods *266 its 60 outstanding shares of capital stock were owned as follows: 35 shares by decedent, 10 shares by decedent's wife, and 15 shares by three of decedent's employees. The quantity of Coca-Cola syrup received on its orders and used in the decedent's five bottling plants amounted to 77,476 gallons during 1939 and 83,509 during 1940. In determining the tax liability of Hugh Smith, Inc. the respondent, acting under section 45, I.R.C., allocated to that corporation so much of the gross income of decedent as was necessary to make the corporation's "royalty" income equal to 20 cents per gallon on all Coca-Cola syrup used by decedent, and, the amounts he so added to that corporation's income for the two calendar years 1939 and 1940 were $13,839.82 and $16,630.87, respectively. In determining the tax liability of the decedent for the year 1939 and the period January 1 to August 25, 1940, the respondent took the position that Hugh Smith, Inc. was taxable to the extent of 20 cents per gallon on each gallon of Coca-Cola syrup purchased by decedent, that the same amounts by which the income of Hugh Smith, Inc. was thus increased would be allowable as deductions in computing *267 decedent's income from his individual bottling business, but that since the corporation was contesting its liability for tax on such additional income, no such deductions had been allowed in computing decedent's net income. The respondent determined that the decedent received $13,839.82 in 1939 and $10,739.47 in the period January 1 to August 25, 1940 as "Distribution received out of capital of Hugh Smith, Inc., in excess of basis of investment," and he increased the decedent's income for those periods by sums equal to 50 per cent of the above-mentioned amounts as a long-term capital gain. During the taxable periods Hugh Smith, Inc. declared no dividends and made no distribution of its capital assets and the latter consisted solely of two automobiles and its contracts with Thomas, Inc. and the decedent Smith. Opinion The first question presented is whether the respondent erred in increasing the tax liability of decedent for 1939 by increasing the inventory as of December 31, 1939 from $13,316.46 to $35,067.36, which increase was occasioned by adding to the inventory of that date, as reported by petitioner, the sum of $21,750.90 as the cost of bottles and cases. Section 22(a) *268 and (c) of the Internal Revenue Code and Regulations 103, section 19.22(c)-1, [1] the applicable statutes and regulation, are set out in the footnote. The method of charging bottles and cases to expense in the years in which they were purchased, rather than including them in inventory as shown by our findings, had been consistently used by decedent from year to year until his death, and this method had been accepted by the Commissioner until the years involved. A similar method had been used by other concerns engaged in the same kind of Coca-Cola business as was decedent, and the method used by those other concerns also had been accepted by the Commissioner. *269 In the tax returns herein involved the bottles and cases were charged to expense in the year they were purchased. When the finished product Coca-Cola contained in the bottles and cases was sold to customers those customers put up a deposit to protect decedent against failure to return the bottles and cases. When, and if, the bottles, or any of them, were returned the customer was refunded his deposit thereon and the amount of the excess of deposits received over refunds made for bottles and cases returned was included in income as part of the "total receipts" of the business under Schedule D of the returns. Under such a method of doing business and reporting income it can not be said that bottles and cases should be included in inventory as "finished or partly finished goods" or "raw materials and supplies, * * * which have been acquired for sale or which will physically become a part of merchandise intended for sale" as prescribed by Regulations 103, and section 19.22(c)-1, supra. Nor can it be said that after the July 3, 1940 amendment to those regulations the "title" to the bottles and cases acquired by decedent and sent customers after that date passed "to the purchaser of the *270 product to be sold therein." Furthermore, we think that this method of accounting and reporting income correctly reflected the income of decedent derived from the use of bottles and cases in his business. It may also be said that in adding $21,750.90 as the cost of bottles and cases to the closing inventory for 1939 and in failing to include $16,301.96 in opening inventory for that year as the cost of bottles and cases then on hand, as respondent did, the decedent's income for that year was distorted. Where inventories are used the amount of the profit for each year can not be accurately determined without comparing the opening and closing inventories. Where the closing inventory is adjusted without correspondingly adjusting the opening inventory for the same year, a distortion of income results. The Thomas Shoe Co., 1 B.T.A. 124; Sinsheimer Bros., Inc., 5 B.T.A. 918; S. C. Toof & Co., 21 B.T.A. 916; Reuben H. Donnelley Corporation, 22 B.T.A. 175, and many others. The respondent erred in increasing the closing inventory here involved by $21,750.90 for the year 1939. As to the period January 1 to August 25, 1940, petitioner *271 has abandoned the issue respecting the respondent's adjustments to both opening and closing inventories for that period. With respect to the second issue, it is shown that during the taxable periods here involved, Hugh Smith, Inc. declared no dividends and made no capital distributions. It is further shown that respondent has allowed decedent no deductions for the amounts he allocated from decedent's gross income as income to Hugh Smith, Inc., computed on the basis of 20 cents per gallon on each gallon of syrup received on its orders and used by the decedent during the taxable periods involved. In Hugh Smith, Inc., Docket No. 8389, 8 T.C. 660, promulgated March 28, 1947, the respondent determined that under section 45 of the Revenue Acts of 1934, 1936, 1938, and the Internal Revenue Code, and in order to correctly reflect the income of Hugh Smith, Inc. and the decedent over a period of years, the corporation's income should be increased by amounts computed on the basis of 20 cents per gallon of the syrup received on its orders and used by decedent and that similar amounts should be eliminated from decedent's gross income. In that case we sustained the application of *272 section 45, supra, and the allocation of such amounts as income to the corporation, and further held that such amounts, which the decedent had in hand and retained, constituted preferential dividends to the decedent as a stockholder of Hugh Smith, Inc. The respondent in his determination, in the instant case, has not eliminated from decedent's gross income from his individual business for the periods involved, the amounts of income allocated to Hugh Smith, Inc., and he has thereby, in effect, already included the preferential dividends in the decedent's taxable income and that action is not now questioned by petitioner. Since the corporation made no distributions other than those preferential dividends, we hold that respondent erred in further increasing the decedent's taxable income by 50 per cent of $13,839.82 for 1939 and $10,739.47 for the period January 1 to August 25, 1940 as long-term capital gains derived from distributions out of capital of Hugh Smith, Inc. in excess of basis of investment. Decision will be entered under Rule 50. Footnotes
1. SEC. 22. GROSS INCOME. (a) General Definitions. - * * *
(c) Inventories. - Whenever in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer upon such basis as the Commissioner, with the approval of the Secretary, may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income. SEC. 19.22 (c) - 1. Need of inventories. - In order to reflect the net income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor. The inventory should include all finished or partly finished goods and, in the case of raw materials and supplies, only those which have been acquired for sale or which will physically become a part of merchandise intended for sale, in which class fall containers, such as kegs, bottles, and cases, whether returnable or not, if title thereto will pass to the purchaser of the product to be sold therein. Merchandise should be included in the inventory only if title thereto is vested in the taxpayer. Accordingly, the seller should include in his inventory goods under contract for sale but not yet segregated and applied to the contract and goods out upon consignment, but should exclude from inventory goods sold (including containers), title to which has passed to the purchaser. A purchaser should include in inventory merchandise purchased (including containers), title to which has passed to him, although such merchandise is in transit or for other reasons has not been reduced to physical possession, but should not include goods ordered for future delivery, transfer of title to which has not yet been effected. * * * [Portion underscored [italics] represents amendment to section 19.22 (c)-1 made by T.D. 4981↩, July 3, 1940.]