PORTABLE INDUSTRIES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 38640. Filed June 30, 1955.

*I. W. Sharp, Esq.*, for the petitioner.
*Stanley W. Ozark, Esq.*, for the respondent.

574

OPINION.

HARRON, *Judge:* The issue to be decided is whether during the taxable years ended March 31, 1949, and March 31, 1950, petitioner was a personal holding company as defined by section 501 of the 1939 Code. Petitioner met the stock ownership requirement of section 501 (a) (2). The issue is restricted to whether the required percentage of gross income of petitioner in each taxable year was personal holding company income within sections 501 (a) (1) and 502. The required percentage would be at least 80 per cent for the year ended March 31, 1949, and the percentage for the year ended March 31, 1950, would be the same, unless petitioner should have been found to be a personal holding company with respect to the year ended March 31, 1949, in which event the required percentage for the year ended March 31, 1950, would be 70 per cent. The provisions of section 501 (a) (1) are set forth in the margin.[1]

The petitioner also admits that some of its income in each taxable year consisted of "royalties" (other than mineral, oil, or gas royalties), and interest. See sec. 502 of the 1939 Code. That is to say, apart from income in the amount of $30,000, the income which is in dispute, petitioner received royalties during the taxable year ended March 31, 1949, in an amount which was approximately 75.6 per cent of gross income. Also, during the taxable year ended March 31, 1950, petitioner received royalties in an amount which was approximately 75.6 per cent of gross income. If it is found that all or part of the $30,000 in dispute which was received during the year ended March 31, 1949, represented "royalties" under section 502, in an amount which would increase the admitted "personal holding company income" from 75.6 per cent to 80 per cent, then, of course, it must be held that petitioner was a personal holding company subject to the surtax in the year ended March 31, 1949. It will follow from that holding that petitioner was a personal holding company subject to the surtax in the succeeding year, the year ended March 31, 1950, because more than 70 per cent of its gross income for the latter year was admittedly from "royalties."

---

[1] SEC. 501. DEFINITION OF PERSONAL HOLDING COMPANY.

(a) GENERAL RULE.—For the purposes of this subchapter and chapter 1, the term "personal holding company" means any corporation if—

(1) GROSS INCOME REQUIREMENT.—At least 80 per centum of its gross income for the taxable year is personal holding company income as defined in section 502; but if the corporation is a personal holding company with respect to any taxable year beginning after December 31, 1936, then, for each subsequent taxable year, the minimum percentage shall be 70 per centum in lieu of 80 per centum * * *; and

(2) STOCK OWNERSHIP REQUIREMENT.—At any time during the last half of the taxable year more than 50 per centum in value of its outstanding stock is owned, directly or indirectly by or for not more than five individuals.

From the foregoing it is clear that the issue to be decided relates to the fiscal year ended March 31, 1949.

In the deficiency notice, the respondent stated his reason for his determination that there were deficiencies in personal holding company surtax in the following way:

it is held that during the years ended March 31, 1949 and March 31, 1950, you were a "personal Holding Company" as defined in Section 501 (a) of the Internal Revenue Code and subject to the surtax imposed by Section 500 thereof.

In its petition, the petitioner set forth among alleged facts upon which it would rely that on April 2, 1948, it entered into a "Service Agreement" with Stemco under which Stemco agreed to pay petitioner $30,000 per year for 2 years for engineering, research, development, and other services to be rendered by petitioner "to improve said inventions, to overcome any dangers connected with their use, and to improve the efficiency and expand the uses of said tools and accessories and to aid in sales engineering"; and that the alleged engineering service fees were not "personal holding company income."

The respondent contends first that at least 80 per cent of petitioner's gross income for the taxable year ended March 31, 1949, was personal holding company income within the meaning of section 502 because the so-called service agreement between petitioner and its licensee, Stemco, lacked substance and was designed to avoid personal holding company surtax liability of petitioner by disguising royalties as engineering fees. He asserts that royalties include compensation for the use of not only the basic invention or patent but also any improvements and developments thereof; that the evidence as to the services petitioner claims it rendered to Stemco under the service agreement is that such services actually consisted of the use of improvements and developments of the basic invention or patent; and that the $30,000 specified in the service agreement was consideration for such use and, therefore, constituted additional royalties. Respondent relies upon *Lane-Wells Co.*, 43 B. T. A. 463, affirmed as to this question 134 F. 2d 977, certiorari denied 320 U. S. 741; *Warren Browne, Inc.*, 14 T. C. 1056; *Anton Dolenz*, 41 B. T. A. 1091 (acq. 1940–2 C. B. 2); *Hugh Smith, Inc.*, 8 T. C. 660, affd. 173 F. 2d 224, certiorari denied 337 U. S. 918; and *Commissioner* v. *Affiliated Enterprises, Inc.*, 123 F. 2d 665, certiorari denied 315 U. S. 812.

The evidence shows that prior to February 24, 1947, Stanley Temple had invented an explosive-operated device capable of driving metal studs and other fasteners into steel and concrete objects. On February 24, 1947, Williams organized Stemco to subcontract the manufacture of the component parts of the device under an informal arrangement with Temple, and to assemble the parts, and package and sell the completed product. On October 1, 1947, Williams personally purchased from Temple the patent rights and applications

covering the tool. In 1947, its first year of operation, Stemco earned $31,340.55, after provision for Federal income taxes. The device was comparatively new and proved extremely dangerous to its users. Safety improvements and the development of additional accessories were urgently required to reduce the hazards involved in the use of the device and to enlarge its utility. In addition, in 1947, a number of claims were asserted against Stemco for injuries allegedly resulting from the new device. Williams feared that claims would be asserted against him personally, as patent owner. On February 6, 1948, he organized petitioner. Throughout the years in question Williams owned 248 shares of each corporation's 250 outstanding shares of no-par common stock. On April 2, 1948, he conveyed his patent rights and applications to petitioner, intending that petitioner would also acquire all other patents subsequently obtained with respect to these tools. These patent rights were not conveyed to Stemco inasmuch as Stemco was experiencing considerable difficulty in obtaining liability insurance, and its assets were exposed to tort claims and judgments. On the same day, April 2, 1948, the two corporations entered into two agreements. In the first, or license agreement, petitioner granted to Stemco a 10-year exclusive license to manufacture, use, and sell within the United States any tools or accessories covered by any patent rights then owned by petitioner or which might be issued to petitioner in the future. Stemco agreed to pay petitioner annual royalties equal to 10 per cent of Stemco's net sales on the first million dollars of sales and 5 per cent of annual sales in excess of one million dollars. The second agreement, or service agreement, is the basis of this controversy. The service agreement was to last for 2 years, and provided that petitioner was to use "its best efforts, technical knowledge and skill to continuously improve the tools, studs, pins and accessories therefor," and to furnish "engineering, research, development and other service to Stemco," in return for which Stemco agreed to pay the sum of $30,000 per year. At this time petitioner had been in existence for less than 2 months, had no facilities, and employed no engineering or technical staff, with the possible exception of Williams, who was president of both corporations and who, although not a graduate engineer, claimed to have had considerable experience with engineering problems. Stemco, on the other hand, employed a staff of engineers who had been working on the devices for Stemco for more than 1 year. The Stemco engineering staff included Temple, the inventor. The service agreement contained the following provision relating to the assistance to be given *to petitioner by Stemco:*

It is understood and agreed that certain engineering and technical employees of Stemco Corporation will assist Portable's officers and engineers in such research and development to an extent which does not interfere with the needs of Stemco. For such services Stemco shall be reimbursed by Portable upon the

presentation of invoices for the time actually spent by such employees upon Portable's business. In no event shall Portable be held liable for any claims for any product liability or defect.

In the year ending March 31, 1949, Rowland J. Kopf, Rudy Witt, Frank Svekric, and Temple were engineers employed by Stemco. Pursuant to the paragraph of the service agreement quoted above, petitioner paid Stemco $15,066.86 for the portion of their working time which Williams considered as having been devoted to "Portable's business." During this year, petitioner employed the following engineers: Evor S. Kerr, a naval engineering officer, who was paid a retainer of $100 per month for 4 months beginning December 1948, and Kopf and Svekric, who were employed only during the month of March 1949, at a total salary of $850.

One of petitioner's contentions is that engineers Kopf, Witt, Svekric, and Temple were part-time employees of petitioner during the year ending March 31, 1949, to the same extent that petitioner reimbursed Stemco for their assistance. The evidence does not support petitioner. These engineers were employed by Stemco before petitioner was organized, were always paid by Stemco, and continued to be so paid after the service agreement was executed. Neither the resolutions of the respective boards of directors which authorized the service agreement, nor the agreement itself purport to change the existing employer-employee relationships, but on the contrary, specifically classify as Stemco employees the engineering and technical personnel for whose services petitioner was required to reimburse Stemco.

The status of these engineers as employees of Stemco pertains more, however, to the construction to be accorded the service agreement than to our primary inquiry concerning the nature of the benefits received by Stemco, in return for which the $30,000 was paid to petitioner.

The evidence concerning the nature of the services purportedly rendered to Stemco consisted primarily of testimony and of an exhibit which Williams identified as "a record of many details of engineering and service work that was rendered by Portable Industries' personnel" up to September 29, 1949. The exhibit lists 42 descriptive phrases of "Details Completed and Completed Problems" accomplished by the engineers, and is incorporated herein by reference.

Except for a few items such "Sales and Service Bulletins," "Accident records file up to date," "New type of Multigraph print forms," and "Dimensional and price catalogue," petitioner admits that each entry describes the completion of a design or redesign of a part of the device or of an accessory.

The petitioner secured the patent applications for these improvements and new accessories, pursuant to Williams' plan to have petitioner own all patent rights touching on the devices invented by Temple, and to have Stemco perform the assembling and selling.

We find from this evidence that the greatest part of the engineers' efforts were devoted to the most urgent problem created by the device, namely, the design or redesign of safer and more efficient parts for the tool and the development of accessories to enhance its use. We also find that this improvement and development was done for the benefit of petitioner, which was the patent holder.

That petitioner itself considered that the improvement and development work was performed on its behalf, as the patent owner, is also indicated by its sworn protest to respondent, executed by Williams on May 1, 1951, in which the reimbursement to Stemco for the assistance of the Stemco engineers is characterized as "wages and salary payments paid or accrued by the taxpayer in connection with engineering, research and exploration of present and future products *to be manufactured by whatever business organizations which may be interested in obtaining such rights from the taxpayer.*" (Emphasis supplied.)

Stemco obtained the rights to incorporate the improvements and new accessories in the parts which it ordered from its subcontractors and in the finished product it sold. We find no merit in petitioner's contention that the improvement and development work on its inventions constituted "engineering services" to Stemco. We think it quite clear in this case that the engineering services involved in improving petitioner's patents were rendered to petitioner, as owner-licensor of the basic patents and of the improvements, and not to Stemco, which, as a licensee, obtained only the use of the new developments.

The respondent properly determined that the principal benefit obtained by Stemco under the service agreement was the right to use petitioner's new accessories for, and improvements to, the basic Temple patents. It is concluded from all the evidence that $20,000 of the $30,000 paid by Stemco in the year ended March 31, 1949, was paid for the use of these new developments. This $20,000 constituted royalties. *Lane-Wells Co., supra; Warren Browne, Inc., supra.* The allocation of two-thirds of the total payment is amply supported by a consideration of the nature of the work accomplished by the engineers and of the urgent need for the development of safety features and accessories which existed at the time the service agreement was executed. On the other hand, the evidence, viewed in its most favorable aspect for the petitioner, namely, that certain services were rendered to Stemco by petitioner in the year ended March 31, 1949, nevertheless

fails to establish that Stemco paid any more than one-third of the $30,000 for such services. These services consisted of the training of Stemco customers and salesmen, the investigation of accidents purportedly caused by the devices, and the preparation of Stemco's sales, service, and price literature. When compared to the benefits obtained by Stemco from the use of the improvements developed for petitioner, it is apparent that these services accounted for but a small portion of the $30,000. It is concluded that Stemco paid $10,000 for these services during the year ended March 31, 1949. *U. S. Universal Joints Co.*, 46 B. T. A. 11.

The petitioner had gross income in the year ended March 31, 1949, in the amount of $127,895.84. It had personal holding company income, in the form of royalties from Stemco, in the total amount of $116,482.98, of which $96,482.98 was paid under the license agreement and $20,000 was paid under the service agreement. Petitioner's personal holding company income exceeded 80 per cent of its gross income, and, accordingly, it is concluded that petitioner was a personal holding company, under the provisions of section 501 (a) of the 1939 Code, in the year ended March 31, 1949. Petitioner's personal holding company income in the year ended March 31, 1950, admittedly exceeded 70 per cent of its gross income, and, accordingly, petitioner was a personal holding company in the year ended March 31, 1950. See sec. 501 (a) (1) of the 1939 Code.

The petitioner makes an alternative contention to its argument that the $30,000 was paid by Stemco for engineering services. The petitioner's argument is that a patent owner, while receiving royalties from a licensee, is under no obligation to the licensee to improve the patents or inventions, and that the $30,000 should be viewed as compensation or reimbursement paid by Stemco to induce petitioner to continue development of its patents and of the inventions on which they are based.

Petitioner cites no authority to support this theory of a patent owner-licensee relationship. In any event, we do not think it applicable to the facts of this case. On April 2, 1948, petitioner had no facilities or technical employees and owned only patent rights which required substantial improvement. Williams desired petitioner to hold not only the Temple patents, but also any related patent rights which subsequently would be acquired. We construe the service agreement not as an inducement for petitioner to act, but on the contrary, as substantially an arrangement for giving petitioner the use of Stemco's engineers and facilities, and the rights to whatever inventions would be developed by these engineers. That the service agreement was required primarily for petitioner's benefit is expressly revealed in the companion license agreement, which states that "the

entering into of said separate agreement for said services and the consideration therein expressed is a part of the inducement *to Licensor* to enter into this agreement." (Emphasis added.) We therefore reject petitioner's argument that the $30,000 fee specified in the service agreement was paid to induce it to improve its patent rights.

We hold that respondent did not err in determining that the petitioner was liable for personal holding company surtax in the years ended March 31, 1949, and March 31, 1950. Because of our finding that $10,000 received by petitioner from Stemco in the year ended March 31, 1949, did not constitute personal holding company income, it will be necessary to recompute the deficiency in surtax for this year under Rule 50.

In view of the conclusions reached, it is unnecessary to consider an alternative contention of the respondent.

An additional problem is raised by petitioner's failure to file personal holding company returns for either of its fiscal years in controversy, as a consequence of which the Commissioner has determined additions to tax under section 291 (a) of the Code.

Williams admitted that he had been a certified public accountant since 1935. The evidence indicates, however, that until 1940, he was controller of the Cleveland operations of an industrial manufacturing firm and from 1940 to 1948 general manager of their Cleveland plant. There is also uncontradicted testimony that Williams consulted with Jules Eshner, a Cleveland attorney, concerning whether petitioner was required to file a personal holding company return for each year in question. Eshner had been engaged in the practice of law in Cleveland for over 30 years and was admitted to practice before The Tax Court of the United States and before the Treasury Department. He was conversant with petitioner's operations, and advised Williams that petitioner was not a personal holding company and that no additional return was required. The return for the year ending March 31, 1950, was prepared by a firm identified as certified public accountants, with whom Eshner testified he consulted at length concerning petitioner's status and the necessity for filing a personal holding company return. We find, on the basis of the foregoing, that the failure to file personal holding company returns for the years ending March 31, 1949, and March 31, 1950, was due to reasonable cause and not due to willful neglect. *Haywood Lumber & Mining Co.* v. *Commissioner,*

178 F. 2d 769, reversing 12 T. C. 735; *O. Falk's Department Store, Inc.*, 20 T. C. 56; Rev. Rul. 172, 1953–2 C. B. 226. Respondent's determination on this issue is disapproved.

*Decision will be entered under Rule 50.*