Estate of Lena B. Knox, Deceased, The Citizens & Southern National Bank, Temporary Administrator, et al. [1] v. Commissioner. Estate of Knox v. Commissioner
Docket Nos. 76390, 76484, 76485.
United States Tax Court
T.C. Memo 1961-129; 1961 Tax Ct. Memo LEXIS 221; 20 T.C.M. (CCH) 642; T.C.M. (RIA) 61129; May 10, 1961
*221 1. A valid plan of liquidation of the Briary, Inc., was adopted at a meeting of the stockholders and directors on March 6, 1951. Section 112(b)(7), I.R.C. 1939, is not applicable to avoid recognition of the gain realized on distribution of the corporation assets in complete liquidation of the corporation because elections to have the benefits of that section were not filed by the qualified electing shareholders within 30 days after adoption of the plan of liquidation. 2. Lena B. Knox was the beneficial owner of 60 percent of the stock of the Briary, Inc., and was taxable on 60 percent of the gain realized upon liquidation of the corporation. 3. There was no involuntary conversion (theft) of Lena's stock within the meaning of section 112(f), I.R.C. 1939. 4. Fair market value of apartment house property determined. 5. Five-year statute of limitations under section 275(c), I.R.C. 1939, held to be applicable. 6. Addition to tax under section 294(d)(1)(A), I.R.C. 1939, imposed. Reasonable cause for failure to file declaration not shown. Computation of addition to tax limited. M.E. Kilpatrick, Esq., Hurt Bldg., Atlanta, Ga., for the petitioner in Docket No. 76390. Harvey H. Hunt, CPA, *222 601 Henry Grady Office Bldg., Atlanta, Ga., Hal Lindsay, Esq., and William G. Grant, Esq., for the petitioners in Docket Nos. 76484 and 76485. James R. Harper, Jr., Esq., for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in income tax and additions to tax against petitioners for the calendar year 1951 in the following amounts: Additions to tax, I.R.C. 1939
Docket
Sec. 294
Sec.
No.
Petitioners
Deficiency
Sec. 293(a)
(d)(1)(A)
294(d)(2)
76390
Estate of Lena B. Knox, Deceased,
The Citizens & Southern National
Bank, Temporary Administrator
$36,846.10
$3,316.14
$2,210.77
76484
Estate of Inman H. Knox, Deceased,
Blodgett Britton Knox, Executor
30,705.09
$1,535.25
2,763.47
1,842.31
76485
B. Britton Knox and Helen L. Knox
27,939.73
1,396.99
2,514.00
1,676.01
The principal issue in all three cases is whether the complete liquidation of the Briary, Inc., a Georgia corporation, was nontaxable to the shareholders under section 112(b)(7) of the Internal Revenue Code of 1939; [2] and in Docket No. 76390, whether the disposition of Lena B. Knox's (hereinafter referred to as Lena) stock in the corporation resulted from an involuntary conversion (by theft), the *223 proceeds from which were expended in the acquisition of property similar or related in service or use so that her gain would not be recognized under section 112(f). If the gain realized by petitioners is found to be taxable, subsidiary issues are: (1) The fair market value of a tract of improved real estate in the city of Atlanta, Georgia, on the date of distribution of the property to the shareholders in complete liquidation of the corporation; and (2) whether the gain was taxable 60 percent to Lena and 20 percent to each of her two sons Inman H. Knox and B. Britton Knox (hereinafter referred to as Inman and Britton, respectively), or 50 percent to each of Inman and Britton. [3]
Assessment of the deficiency in Docket No. 76390 is barred by the statute of limitations under section 275(e) (assessment *224 of tax on amounts distributed in liquidation of a corporation) unless it is permitted under section 275(c). There is no issue with respect to the statute of limitations in Docket Nos. 76484 and 76485. Respondent concedes the issue as to the additions to tax under section 294(d)(2). Petitioner in Docket No. 76390 contends that Lena had reasonable cause for failing to file a declaration of estimated tax for the year 1951 and that the addition to tax under section 294(d)(1)(A) is not applicable. Petitioners in Docket Nos. 76484 and 76485 do not argue the applicability of the additions to tax under either sections 293(a) or 294(d)(1)(A) on brief and issues with respect thereto will be considered conceded by those petitioners. The three cases were consolidated for trial and opinion. Findings of Fact The stipulated facts are so found. Lena, Inman, and Britton were all living and residents of Atlanta, Georgia, in 1951, and each filed an individual income tax return for the calendar year 1951 with the collector of internal revenue for the district of Georgia. Lena's return was filed on March 15, 1952. On January 15, 1957, the duly appointed and acting executor of her estate executed a consent *225 extending the statute of limitations for assessment of Lena's income tax for 1951 to June 30, 1958. The notice of deficiency in Docket No. 76390 was dated June 13, 1958. Both Lena and Inman died before the trial of this case. The Briary, Inc. (hereinafter referred to as Briary), was organized in 1939 with 5 shares of capital stock being issued to the following persons as beneficial owners: Lena B. Knox - Certificate No. 1 - 3 shares Inman H. Knox - Certificate No. 2 - 1 share Blodgett Britton Knox - Certificate No. 3 - 1 share No additional stock was ever issued by the corporation. Inman was president of the corporation and Britton was vice president, secretary and treasurer, and Inman, Britton, and Lena were the directors of the corporation throughout its existence. The property of Briary consisted of a contiguous plot of land bordering on Peachtree Road and Peachtree Memorial Drive in Atlanta upon which were erected eight apartment buildings, [4] containing 58 individual apartments. Two of these buildings were constructed in 1929 and the other six in 1939 and 1940. The property had been conveyed to Britton in 1929 by his father, who died in 1940, and was held in Britton's name at the *226 time it was transferred to the corporation. It was transferred to the corporation in 1939, with the corporation assuming any liabilities against it, in exchange for the 5 shares of capital stock originally issued as above. Lena took no part in the management of the affairs of Briary although she signed the minutes of directors and stockholders meetings, which indicated that she was present, from the inception of the corporation up to and including the annual meeting in January 1949. She did not sign minutes of any meetings held during 1950 and 1951 although the minutes stated that all directors and stockholders were present and waived notice. Inman and Britton, along with Rankin-Whitten Realty Company, managed the property and collected the rents therefrom. The corporation paid no dividends. Inman and Britton both drew salaries from the corporation. Inman, who was unmarried and lived with his mother in the family home, paid over to or used a large part of *227 his salary for the maintenance and support of his mother, who had no other source of income. Inman and Britton at times also used some of their salaries for the benefit of other members of the family at their mother's request. When the original shares of the corporation were issued in 1941 Lena delivered certificate No. 1 evidencing her 3 shares of stock to Inman and Britton with the oral understanding that they were to manage the corporation, to hold the 3 shares of stock for Lena during her lifetime, and, following her death, to divide it equally among those of her nine children who survived her. Certificate No. 1 was assigned by Lena to Inman and Britton. The assignment was dated February 5, 1941, and was signed by Lena either at the time she delivered the certificate to Inman and Britton in 1941 or, at Inman's request, in January 1951. On March 6, 1951, certificate No. 1 was canceled and certificate Nos. 4 and 5, each representing 1 1/2 shares of stock, were issued to Inman and Britton, respectively. By instrument dated January 23, 1951, but not at that time exhibited to other members of the family, Inman and Britton acknowledged in writing that the real estate above mentioned *228 was owned four-fifteenths, or 26 2/3 percent, by each of them and onefifteenth, or 6 2/3 percent, by each of the other seven children of Lena, recognizing an equal division of Lena's original 60 percent interest in the corporation among her nine children. The instrument also provided for the continued management of the property by Inman and Britton. Lena was not mentioned in the instrument although the property was on that date owned by Briary. In 1948, Lena, who was then 78 years of age, suffered a stroke and thereafter became increasingly feeble in both mind and body. She was being given a sedative drug under her doctor's directions throughout the latter part of the year 1950 and the first half of 1951. At times her mind seemed clear and at other times she did not seem to understand the import of business matters discussed with her. In early 1951, Inman and Britton, acting on the advice of a certified public accountant, undertook to dissolve and liquidate Briary pursuant to the provisions of section 112(b)(7). Inman discussed the matter with Lena and suggested that due to her infirmities her stock be transferred to Inman and Britton and the real estate distributed to them in liquidation *229 of Briary. Lena agreed to having title to the property taken in the names of Inman and Britton provided her 60 percent interest would be held for her benefit during her lifetime and then distributed equally among her children after her death. On March 6, 1951, after transferring and reissuing Lena's stock in Briary as above noted, Inman and Britton purportedly held a joint meeting of the stockholders and directors of Briary at which a resolution was adopted dissolving the corporation and authorizing the distribution of all its property to Inman and Britton, "the owners of all of the capital stock of the corporation issued and outstanding" in liquidation of the corporation, which was to be in accordance with the provisions of section 112(b)(7). Lena was not present at this meeting although the minutes state that all stockholders and directors were present, and she did not sign the minutes. On March 23, 1951, based on the resolution of dissolution adopted at the above meeting, an order and judgment was entered by the Superior Court of Fulton County, Georgia, dissolving Briary. On the same day Inman and Britton caused Briary to execute and deliver a deed conveying to them all of its *230 property and assets, subject to its liabilities "in satisfaction and payment of their respective shares of stock," which deed was duly recorded. A similar deed dated March 28, 1951, was executed by Inman, Britton, and Lena, in their capacities as directors of Briary, which deed was not recorded. Inman obtained Lena's signature on this document. On April 12, 1951, Inman and Britton each filed in the office of the collector of internal revenue a Form 964, Election of Shareholder under Section 112(b)(7) of the Internal Revenue Code, executed by each of them under penalties of perjury. The form filed by each recited that he was the actual "owner" of 2 1/2 shares of the common stock of Briary and no mention was made of any beneficial interest Lena might have therein. No such election form was ever filed by or in the name of Lena. John S. Knox, another of Lena's sons, noticed in a local newspaper publication of the fact that Briary had been dissolved. John discussed the matter with his mother and also with his son John S. Knox, Jr., who was an attorney. John, Jr., asked Inman and Britton if this was a fact and, if so, what disposition had been made of Lena's 60 percent interest in the stock *231 or property. He was advised that there was a written document providing for disposition of Lena's share in the property but he was not permitted to see the document. Thereupon, Suzanne Knox Shepherd, a daughter of Lena's, consulted present counsel for Lena's estate in an effort to protect Lena's interest in the property, and incidentally, the interests of the other brothers and sisters as potential heirs of Lena. Efforts were made by counsel for Lena and Suzanne and counsel for Inman and Britton to work out an amicable and satisfactory solution to the problem. By letter dated April 12, 1951, counsel for Inman and Britton wrote a letter to all the other children of Lena, stating that the property formerly belonging to Briary was held by Inman and Britton as trustees for themselves and all the other children in the amounts of four-fifteenths for each of Inman and Britton and one-fifteenth for each of the other children. A trust instrument to this effect was drafted, but Inman and Britton refused to sign it because it contained no provision giving them the right to continue management and control of the property. Shortly thereafter a suit was instituted in behalf of Lena in the Superior *232 Court of Fulton County seeking a conveyance to Lena of a 60 percent undivided interest in the real estate formerly owned by Briary and enjoining the payment of more than 40 percent of the receipts from the real estate to Inman and Britton. The petition in that proceeding was signed by counsel for Lena and was verified by Suzanne stating that she had been requested by Lena to confer with counsel in preparation of that suit, and alleged among other things that Lena had been prevailed upon by Inman and Britton to permit dissolution of Briary and distribution of its assets to the stockholders, for certain tax advantages, that Lena had agreed that the real estate be placed in the names of Inman and Britton until a proper form of trust agreement could be prepared by which her 60 percent interest would be protected, that Inman and Britton had refused to sign such an agreement, and that Lena was no longer willing for them to act as trustees for her. Inman and Britton filed a special motion in said proceeding in which they sought to require counsel for Lena to produce or prove the authority under which they were proceeding, averring that Lena was not mentally competent to employ counsel for *233 herself. They also filed an answer in which was related the history and management of the corporation and property, acknowledged Lena's interest in the property, disclaimed any intention of claiming title to Lena's interest in the property, and averred a willingness at all times to execute a trust deed showing that they held title to the property for the use and benefit of their mother to the extent of her 60 percent interest, provided that the instrument gave them exclusive management and control of the property during Lena's lifetime in accordance with her expressed wish. A consent decree was entered in the above proceeding on June 21, 1951, in which title to the real estate was decreed to vest 60 percent in Lena and 20 percent in each of Inman and Britton; Rankin-Whitten Realty Company, under its management contract, was directed to distribute monthly the net proceeds from the real estate 60 percent to Lena and 20 percent to each of Inman and Britton; Inman and Britton were authorized to manage the property during Lena's lifetime, subject to the rights and powers granted Rankin-Whitten under the management contract; and the court retained jurisdiction of the proceeding and of Lena's *234 60 percent interest in the property during her lifetime for the purpose of entering such orders as might be necessary from time to time to enable Inman and Britton to properly manage and finance the property. By letters dated January 28, 1952, respondent advised Inman and Britton that their elections (Form 964) had not been filed within 30 days after the adoption of the plan of liquidation by Briary, as required by section 112(b)(7)(D), and that the distribution received by them should be reported on their tax returns. The transaction was not reported on the returns of either Inman or Britton for the year 1951. Lena did not report any gain from the liquidation of Briary on her tax return for 1951. A statement was attached to the return stating in substance that Lena's only source of income was from the apartment buildings on Peachtree Road and Peachtree Memorial Drive, in which she acquired a 60 percent interest by a court decree dated June 21, 1951 (stating the file number of the case); that petitioner had no previous records as to values or rates of depreciation on the property, but had been advised by counsel to claim depreciation on 60 percent of the present value of the improvements, *235 estimated to be $400,000, at 2 1/2 percent; and that a record of all rent statements and expenses incurred in management of the property was available for examination by respondent's agents in the office of petitioner's counsel. The property involved was located on the corner of Peachtree Road and Peachtree Memorial Drive, about 4 1/2 milles from the central business district of Atlanta, on its principal north-south street. It fronted approximately 177 feet on Peachtree Road and extended back at irregular widths and at a slight downgrade about 1,425 feet along Peachtree Memorial Drive to Peachtree Creek. The improvements on the property consisted of two 3-story brick veneer buildings fronting on Peachtree Road, containing twelve 5-room apartments each, constructed in 1929; and six 2-story brick veneer buildings fronting on Peachtree Memorial Drive containing a total of thirty-four 5-room apartments constructed in 1939 and 1940, plus some lean-to type garages. The property was outside the city limits in 1951 but was served by good public transportation, and there was a new school and shopping center nearby. It was in a good residential area but was becoming commercialized along Peachtree *236 Road. The property was somewhat run down in 1951, despite rather large expenditures for maintenance and repairs, and had not been sold since the improvements were built. It was under rent control in 1951. The gross income per rent roll as of March 23, 1951, was approximately $66,000. The fair market value of the property was determined to be $462,420 in the notice of deficiency. The income tax return of Briary for the fiscal year ending March 23, 1951, showed a capital deficit at that date of $40,871.19, and no earned surplus. The operating statement of Briary, per its income tax returns, for the years 1948, 1949, and 1950 reported gross rentals, expenses, and net losses as follows: 1948
1949
1950
Rents
$62,057.65
$59,802.24
$60,156.23
Expenses
67,365.50
66,955.94
72,292.41
Net loss
(5,307.85)
(7,153.70)
(12,136.18)
Ultimate Findings Lena was the beneficial owner of 60 percent of the capital stock of Briary at the time it was liquidated. Inman and Britton were the owners of record of all of the outstanding capital stock of Briary on March 6, 1951, but were holding a 60 percent interest therein for the use and benefit of Lena. They had no intention of converting or appropriating her interest to themselves. *237 A valid plan of complete liquidation of Briary was adopted on March 6, 1951. Elections to have the benefits of subparagraph (A) of section 112(b)(7) were not filed by shareholders who, at the time of adoption of the plan of liquidation, owned 80 percent of the stock of Briary, within 30 days after the adoption of the plan of liquidation. The fair market value of the real estate distributed by Briary in liquidation on March 23, 1951, was $415,000. In addition, office equipment having a fair market value of $500 and cash in the amount of $818.46 was also distributed by Briary to Inman and Britton. The liabilities of Briary on March 23, 1951, were $214,272.80. The bases of the three beneficial owners of the stock of Briary in that stock just prior to liquidation were as follows: Lena
3 shares
$3,900
Inman
1 share
1,300
Britton
1 share
1,300
Opinion If a valid plan of complete liquidation of Briary was adopted on March 6, 1951, section 112(b)(7) will not prevent recognition of gain on the distribution by Briary to its stockholders of all its assets in complete liquidation of the corporation because the elections to take advantage of that section were not filed within 30 days after adoption of the *238 plan as required by the statute. Section 112(b)(7) provides in substance that its benefits may be availed of by electing shareholders only if the holders of at least 80 percent of the voting stock of the corporation file written elections in the manner prescribed by the Commissioner within 30 days after adoption of the plan of liquidation. [5] *239 *240 It is agreed here that no elections were filed by any stockholders within 30 days after March 6, 1951, and that no election was ever filed by or in the name of Lena. So whether Lena or her two sons owned the 3 shares of stock originally issued to Lena, no valid and timely elections were filed within 30 days after March 6, 1951. Petitioners seek to avoid this result by claiming that Lena was incompetent in 1951 and could not and did not attend the meeting of March 6, waive notice thereof, assign her rights to anyone else, or agree to or adopt the resolution of dissolution and plan of liquidation purportedly adopted at the March 6 meeting of stockholders and directors. Therefore, they argue, no valid plan of liquidation was adopted on March 6, but a plan of liquidation was first adopted either on March 23 when the order formally dissolving the corporation was entered by the Superior Court and the deed conveying all its assets to Inman and Britton in liquidation of their stock was executed in the name of the corporation, or on June 21 when *241 the Superior Court entered the consent order decreeing that title to a 60 percent undivided interest in the real estate formerly owned by Briary was vested in Lena. From this they argue that the elections filed by Inman and Britton on April 12 were filed within the 30 days required by the statute; with respect to the June 21 date, the argument being that the statutory language "within thirty days" does not fix the beginning but only the end of the period, so that performance of the act (filing the elections) prior to the event (adoption of the plan of liquidation) satisfies the requirement of the statute. To prevail on this argument it would seem that petitioners have to rely on the authority of Inman and Britton to act for their mother and/or the corporation at one time and disavow their right to so act at another. In the case of Lena, in order to meet the requirement that an election was made in her behalf, petitioner must rely on the fact that when Inman and Britton filed their elections they were electing not only in behalf of themselves with respect to the 1 share owned beneficially by each but also as undisclosed trustees for the 3 shares owned beneficially by Lena. But there *242 is no satisfactory explanation of why, if Inman and Britton were authorized to act as undisclosed trustees for Lena's interests in performing these acts, they were any less authorized to act in Lena's behalf in adopting the resolution of dissolution and plan of liquidation at the meeting of directors and stockholders on March 6. In the case of Inman and Britton, petitioners claim that no valid plan of liquidation was adopted at the meeting of March 6 because there could be no valid meeting of the board of directors in the absence of notice to or waiver of notice by each and every director. They cite no authority for this statement. Section 22-1873 of the Georgia Code provides that a corporation may be dissolved by adoption of a resolution of dissolution by the board of directors concurred in by the stockholders holding two-thirds of the stock, and certified to the Superior Court. Section 22-1865 of the Georgia Code provides that a majority of the directors constitute a quorum for the transaction of a business. Two of the three directors were admittedly present at the meeting of March 6. Petitioners cannot contend that the resolution was not approved by the holders of two-thirds of *243 the stock because they claim they were the owners of all the stock in filing the elections under section 112(b)(7). They also signed the minutes of the meeting of March 6 wherein it is stated that all the directors and stockholders were present, and certified the resolution adopted at this meeting to the Superior Court as the basis for issuance of the order of dissolution entered March 23, upon which they rely in part as the adoption of a plan of liquidation. We find no evidence competent to contradict the minutes and certificate mentioned above proving that notice of the meeting was not given, or that notice was not waived, or that the meeting was not competent to transact business. But regardless of whether petitioners may rely on what we consider to be inconsistent and incompatible positions in support of their claims, we believe the evidence supports the conclusion that a valid plan of complete liquidation of Briary was adopted at the meeting on March 6, 1951, and we have so found. This finding was based on a consideration of all the evidence presented, the details of which we find unnecessary to review here. The real question is whether Lena was such a necessary participant in *244 the meeting of March 6 that her absence therefrom or here alleged incompetence to act nullified the action taken by Inman and Britton at that meeting. The best evidence of what transpired at the meeting is the minutes themselves which stated that all directors, which would include Lena, were present and approved the action taken. The only statutory authority for dissolving the corporation and distributing its assets was given at that meeting. The Superior Court acted solely on the basis of action taken at that meeting to dissolve the corporation. In the proceeding instituted in the Superior Court by Lena against Inman and Britton which resulted in the consent decree of June 21, all three of them acknowledged in their pleadings that the corporation had been validly dissolved and the property distributed to Inman and Britton as planned. The complaint was that after distribution Inman and Britton were converting the property to their own use rather than holding Lena's share in trust as agreed upon. In entering the consent decree the court must have recognized the validity of the dissolution of the corporation and the distribution of its assets in liquidation - otherwise the corporation *245 would have been a necessary party to the proceeding. The evidence is convincing that reliance on Lena's absence from the meeting and her incompetency is an afterthought to help solve the tax dilemma resulting from the failure to file the elections under section 112(b)(7) on time. If Lena was not present at the meeting this alone would not invalidate the meeting or the action taken there. Inman and Britton were the sole stockholders of record. Throughout the Georgia statute dealing with corporations, Ga. Code Ann., secs. 22-1801 et seq. (Supp. 1958), the provisions and requirements refer to stockholders of record. In fact, the parties rely on Inman and Britton being the sole stockholders entitled to act in attempting to show that the necessary elections were filed under section 112(b)(7). There is no requirement called to our attention that a plan of liquidation be approved by all directors. The Georgia Code, section 22-1865, provides that a majority of the directors constitute a quorum and that the act of the majority of the directors present in a meeting at which a quorum is present shall be the act of the board of directors; and there is no evidence that the bylaws of Briary provided *246 otherwise. While section 22-1873 of the Georgia Code requires that notice be given to the stockholders of record of a meeting to consider a resolution of dissolution, the statute says nothing about notice being given to all directors. Further, Lena's execution of the unrecorded deed of March 28 as a director of the corporation is evidence of her approval of the action taken. This leaves then only the possibility that Lena's alleged incompetency might in some way invalidate the meeting of March 6 and the action taken at that time. We have pointed out above that Lena's presence at the meeting, either mentally or physically, was not necessary for the valid adoption of a plan of liquidation at that meeting, unless it can be shown that Lena was in fact a stockholder of record at that time. There is no question that her stock had been transferred on the books of the corporation at the time of the meeting - but petitioner in Docket No. 76390 does claim that she was incapable of assigning her stock to Inman and Britton in the early part of 1951. The preponderance of the evidence indicates she actually assigned the stock to Inman and Britton in 1941 as shown on the back of the certificate, *247 the only evidence to the contrary being a statement in affidavit form made by Inman in 1951 during the pendency of the Superior Court suit to the effect that he had discussed the plan of liquidation with his mother in January 1951 and obtained her signature on the stock certificate at that time. Furthermore, the burden of proof is on petitioners to show that Lena was so incompetent at any particular time as to invalidate her acts at that time. While petitioners in all three cases request this Court to find as a fact that after 1948 or 1949 Lena became mentally incapacitated and incompetent, none of them state any criteria for determining this fact or point to any competent evidence upon which such a finding could be based, or argue what specific effect it would have on this proceeding if such were a fact. There was no competent medical evidence of Lena's mental incapacity at any time, the only evidence being the general testimony of Britton and another son and daughter to the effect that Lena was taking drugs in 1951 and was incapable of understanding business transactions, although Britton also testified that when his mother signed the unrecorded deed dated March 28 he regarded this *248 as transferring title to Inman and himself. On the other hand, a suit was instituted in Lena's name in May 1951 in which her mental competency was specifically raised and the Superior Court of Fulton County entered a decree in that proceeding vesting title to real estate in her. On this record we cannot find that Lena was mentally incompetent when she performed any act pertinent to this proceeding.
We have concluded that a valid plan of complete liquidation of Briary was adopted on March 6, 1951, and, no elections to have the benefits of section 112(b)(7) having been filed within 30 days thereafter, that that section is not applicable. Our conclusion that Inman and Britton at all times held 60 percent of the stock of Briary and a 60 percent interest in the real estate distributed to them upon liquidation of Briary for the use and benefit of Lena disposes of petitioner's contention in Docket No. 76390 that no gain is recognizable to Lena under section 112(f) because her stock was involuntarily converted, by theft, into property similarly related in service or use. It would unnecessarily prolong this opinion to discuss the evidence on this point. The record is clear that Inman and Britton *249 at all times acted in good faith with their mother and at no time intended to convert her interest in the stock or property to their own use and benefit. The fact that Lena's stock was transferred to Inman and Britton and that title to the property was distributed in their names is understandable under the circumstances and does not connote theft, and, in fact, Lena acknowledged that this was done with her consent in her petition filed in the Superior Court. If any theft occurred it would have had to occur after the distribution in liquidation of Briary, which was the taxable event here involved. The above conclusion also disposes of the issue whether Lena was taxable on 60 percent of the gain realized on the liquidation of Briary or whether Inman and Britton were each taxable on 50 percent thereof. The evidence indicates that while Inman and Britton were the holders of record of all the stock of Briary at the time the corporation was dissolved and the liquidating distribution was made, they held a 60 percent interest in the stock and in the property distributed for the use and benefit of Lena, and that Lena was the beneficial owner thereof and was taxable on 60 percent of the gain *250 realized; Inman and Britton each being taxable on 20 percent thereof. [6]
Turning now to the valuation question, we have found that the fair market value of the real estate and improvements thereon on the date of distribution was $415,000. This is based primarily on the opinions of the expert witnesses offered by both sides, weighed, as in our judgment seems appropriate, in the light of their experience, knowledge of the property and similar property in the same vicinity, the factors they took into consideration in arriving at their opinions as to value, and on other factors including our observation of the witnesses on the stand. We have also given some consideration to other evidence of value such as the testimony of Britton, who was in the real estate business and probably knows more about this property than anyone else although it is also recognized that he has a decided interest in the matter. A brief summary of the evidence is as follows. Three expert witnesses, in addition to Britton, testified for petitioners. T. E. Johnson appraised this property for purposes of refinancing a loan in the summer of 1950 at about *251 $333,000. He testified that he took a 1947 appraisal and brought it up to date; that the additional money to be loaned was under $20,000 with the total loan being less than 60 percent of the appraised value; that in determining value for loan purposes a lower multiple of gross income from the property might be used than the multiple used in determining value for sale purposes; and that the usual multiple used for the latter purpose was 6 to 6 1/2 times gross income. J. H. Whitten, a real estate man of long experience in Atlanta whose firm managed this property, testified that in his opinion the fair market value of this property was $360,000 in 1951. This was based for the most part on his general knowledge of real estate values in Atlanta and his knowledge of this property, the fact that he offered to buy the lower 16 units nearest Peachtree Creek for $85,000 in 1951 and the Knoxes would have sold them for $90,000, and his use of gross and net income figures. Britton testified that because of the creek flooding this lower land and apartments they were not as valuable as they would have been had they been on higher land. Whitten gave little explanation of how he used gross and net *252 income figures. A. F. Winecoff placed a value of the property of $330,000 without much explanation of how he arrived at it. He appeared to be relying somewhat on assumed net income based on the actual gross income figures but then reverted to multiples of gross income in justifying his valuation, using a multiple of 5 times gross income. One expert witness, John S. Schneider, testified for respondent and placed a value of $466,500 on the property. His appraisal was based on three approaches: The replacement cost approach giving a value of $485,500, the capitalization of income approach giving a value of $435,450, and the market approach, or use of sales of comparable properties, giving a value of $466,500. He used the latter figure for his final value because he thought the market approach was the soundest and because it was between the other two figures. Schneider's approach to the question was more precise than that of the other witnesses, but it was also true that he was not as familiar with this property in 1951 as were the other witnesses, and there were certain factors, such as the fact that the lower property was often flooded, that he was unaware of and did not take into consideration. *253 The property involved, which is described in our Findings of Fact, and the evidence presented are not such that a determination of value can be made with precision. One factor emerges from the testimony of the expert witnesses and that is that all of them recognize the use of a multiple of gross income as a method of valuing rental properties. They do suggest different multiples based on other factors involved. The concensus of opinion and evidence of the multiples at which comparable properties sold indicates that a multiple of between 6 and 7 times the gross income should be appropriate for this property. We have given considerable weight to this factor in arriving at our conclusion as to value. The final two issues were presented only in Docket No. 76390. The first is whether assessment of a deficiency against Lena is barred by the statute of limitations. Her return for 1951 was filed March 15, 1952, and, while not specifically reporting the liquidation of Briary, did have attached the statement hereinafter discussed. A consent extending the time for assessment to June 30, 1958, was executed by the executor of Lena's estate on January 15, 1957, more than 4 years but less than 5 *254 years after the return was filed. The notice of deficiency was dated June 13, 1958. Section 275(e) provides a 4-year period of limitation in the case of omission from gross income of amounts properly includible therein as amounts distributed in liquidation of a corporation. Section 275(c) provides a 5-year period of limitation in the case of omission from gross income of an amount properly includible therein which is in excess of 25 percent of the gross income stated in the return. The extension of January 15, 1957, was ineffective unless section 275(c) is applicable. Sec. 276(b). There is no question that, as a result of our conclusion that Lena realized taxable gain on 60 percent of the liquidating distribution, she omitted more than 25 percent of the gross income reported on her return. Petitioner argues, however, that by the statement attached to her return Lena fully apprised respondent of all the facts necessary for him to make a determination of deficiency, and that under such circumstances section 275(c) is not applicable. The statement attached to Lena's return, upon which petitioner relies, stated, in substance, that petitioner's only source of income was rent from the property *255 here involved, the title to a 60 percent interest in which she acquired by a court decree dated June 21, 1951, in a case wherein two of her sons were named as defendants, being case No. A-24349, Fulton Superior Court; that she had no records of the prior depreciation claimed on the improvements and had been advised by counsel to claim depreciation of 2 1/2 percent on 60 percent of the present value of the improvements, estimated to be $400,000; and that her attorneys had in their files statements of all rents received and expenses incurred in management of the property and could supply any additional information that might be helpful in determining the correctness of her return. Petitioner relies on Colony, Inc. v. Commissioner, 357 U.S. 28 (1958), and cases following it, holding that section 275(c) does not apply if there is an error in reporting an item disclosed on the face of the return or where the nature and amount of the additional income is disclosed on the return itself or a statement attached thereto. In our opinion, none of those cases supports petitioner's position here. For example, in Colony, Inc. v. Commissioner, supra, taxpayer understated the gross profit on sales *256 of real estate as a result of overstating the basis in the property; in Lawrence v. Commissioner, 258 F. 2d 562 (C.A. 9, 1958), reversing 27 T.C. 713 (1957), taxpayer omitted from gross income over $20,000 of capital gain, but by an accompanying schedule indicated that the amount had been received from the liquidation of a corporation; in Davis v. Hightower, 230 F. 2d 549 (C.A. 5, 1956), taxpayer reported 50 percent of the profit on the sale of cotton as gain on sale of capital assets, whereas the Commissioner determined the profit was ordinary income. In each of the cases cited, there was a disclosure on either the face of the return or a statement attached of sufficient information to permit the Commissioner to determine from the information submitted that the taxpayer either had made an error in computation or had taken a position with respect to the nontaxability of certain income which resulted in the omission in excess of 25 percent of gross income reported. Here no mention was made of the liquidation of the corporation, which was the transaction giving rise to the income omitted, and no amount was included in gross income as capital gain. The statement attached would put *257 the Commissioner on notice only that there might be some question on the amount of depreciation allowable. It was only if the Commissioner began checking the depreciation question that he might run onto the omission of gross income here involved. In our opinion, the disclosure on the return have to be more directly related to the omitted income than that, to make section 275(c) inapplicable. We conclude that assessment of the deficiency determined in Docket No. 76390 is not barred by the statute of limitations. The final question is whether the addition to tax for the failure of Lena to file a declaration of estimated tax should be imposed. This addition to tax is imposed under authority of section 294(d)(1)(A) which contains an exception if the failure is shown to the satisfaction of the Commissioner to have been due to reasonable cause and not to willful neglect. Petitioner relies on the principle that the failure to file a declaration is due to reasonable cause and not to willful neglect in the situation where the taxpayer is advised by counsel that he is not liable for tax, citing Commissioner v. American Ass'n of Eng. Emp., 204 F. 2d 19 (C.A. 7, 1953), affirming a Memorandum *258 Opinion of this Court; Portable Industries, Inc., 24 T.C. 571 (1955). There is no evidence that Lena relied on advice of counsel in not filing a declaration. While it does appear from the statement attached to her return and discussed above that she did rely on her attorneys for advice with respect to computing the amount of her net rental income on her final return, there is no evidence or even an implication that counsel advised her that the rental income she received after entry of the consent decree was not taxable income, and that alone was sufficient to require her to file a declaration. Sec. 58(a). However, it is apparent that until the consent decree was entered on June 21 there was no assurance that Lena would receive any taxable income in 1951; consequently, the requirement that she file a declaration was not met until after June 1, and under section 58(d) no declaration was due until September 15, so the estimated tax was required to be paid in only two installments rather than four. We conclude that petitioner has failed to prove that Lena's failure to file a declaration of estimated tax was due to reasonable cause and not willful neglect and that an addition to tax was *259 properly imposed. However, it should be computed on the basis that the declaration and first installment were not due until September 15, 1951. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Estate of Inman H. Knox, Deceased, Blodgett Britton Knox,, Executor, Docket No. 76484, and B. Britton Knox and Helen L. Knox, Docket No. 76485.↩
2. All references are to the 1939 Code and regulations unless otherwise indicated. ↩
3. Respondent determined that 60 percent was taxable to Lena in Docket No. 76390 and that 50 percent was taxable to each of Inman and Britton in Docket Nos. 76484 and 76485, but admits that if Lena owned the beneficial interest in 60 percent of the stock, Inman and Britton are each taxable on only 20 percent of the gain.↩
4. At times the parties refer to 10 apartment buildings rather than 8. Apparently 2 of the buildings fronting on Peachtree Memorial Drive contained firewalls separating them into two units which might be considered separate buildings.↩
5. SEC. 112. RECOGNITION OF GAIN OR LOSS. (b) Exchanges Solely in Kind. - * * *
(7) Election as to recognition of gain in certain corporate liquidations. - (A) General Rule. - In the case of property distributed in complete liquidation of a domestic corporation, if - (i) the liquidation is made in pursuance of a plan of liquidation adopted after December 31, 1950, whether the taxable year of the corporation began on, before, or after, January 1, 1951: and (ii) the distribution is in complete cancellation or redemption of all the stock, and the transfer of all the property under the liquidation occurs within some one calendar month in 1951, 1952, or 1953 - then in the case of each qualified electing shareholder (as defined in subparagraph (C)) gain upon the shares owned by him at the time of the adoption of the plan of liquidation shall be recognized only to the extent provided in subparagraphs (E) and (F). * * *
(C) Qualified Electing Shareholders. - The term "qualified electing shareholder" means a shareholder (other than an excluded corporation) of any class of stock (whether or not entitled to vote on the adoption of the plan of liquidation) who is a shareholder at the time of the adoption of such plan, and whose written election to have the benefits of subparagraph (A) has been made and filed in accordance with subparagraph (D), but - (i) in the case of a shareholder other than a corporation, only if written elections have been so filed by shareholders (other than corporations) who at the time of the adoption of the plan of liquidation are owners of stock possessing at least 80 per centum of the total combined voting power (exclusive of voting power possessed by stock owned by corporations) of all classes of stock entitled to vote on the adoption of such plan of liquidetion: or * * *
(D) Making and Filing of Elections. - The written elections referred to in subparagraph (C) must be made and filed in such manner as to be not in contravention of regulations prescribed by the Commissioner with the approval of the Secretary. The filing must be within thirty days after the adoption of the plan of liquidation, and may be by the liquidating corporation or by the shareholder.
6. The basis of all stockholders in each share of stock was the same.↩